142 F.3d 279
 41 Fed.R.Serv.3d 58
 Robert S. CATZ (96-3114/5776); Shawn D. Catz and Jason A.
Catz (96-5776), Plaintiffs-Appellants,
v.
Susan R. CHALKER (96-3114/5776); Leonard I. Karp and
Annette Everlove (96-3114); Fidelity Investments,
Inc., Waterhouse Securities, and
TIAA-CREF, Inc. (96-5776),
Defendants-Appellees.
 Nos. 96-3114, 96-5776.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 31, 1997.
Decided April 16, 1998.
 
 Robert S. Catz (argued and briefed), Nashville, TN, Michael D. Mosher (argued), Michael D. Mosher & Associates, Paris, TX, for Plaintiff-Appellant Robert S. Catz in No. 96-3114.
 Charles R. Ray (briefed), Nashville, TN, Robert S. Catz (argued), Nashville, TN, for Plaintiffs-Appellants Shawn D. Catz and Jason A. Catz in No. 96-5776.
 Charles R. Ray (briefed), Nashville, TN, Michael D. Mosher (argued), Michael D. Mosher & Associates, Paris, TX, for Plaintiff-Appellant Robert S. Catz in No. 96-5776.
 Charles W. McElroy (argued and briefed), Boult, Cummings, Conners & Berry, Nashville, TN, Mark B. Cohn and Jeffrey A. Huth (briefed), McCarthy, Lebit, Crystal & Haiman, Cleveland, OH, for Defendant-Appellee Susan R. Chalker in No. 96-3114.
 Byron R. Trauger (briefed), Gregory Mitchell (briefed), Doramus & Trauger, Nashville, TN, for Defendant-Appellee Fidelity Investments in No. 96-3114.
 Mark B. Cohn (briefed), McCarthy, Lebit, Crystal & Haiman, Cleveland, OH, for Defendants-Appellees Waterhouse Securities, Teachers Insurance and Annuity Association of America, College Retirement Equity fund, Ohio State Teachers Retirement System in No. 96-3114.
 Charles W. McElroy (argued and briefed), Boult, Cummings, Conners & Berry, Nashville, TN, Mark B. Cohn (briefed), McCarthy, Lebit, Crystal & Haiman, Cleveland, OH, for Defendant-Appellee Annette Everlove in No. 96-3114.
 L. Beth Evans, Waller, Lansden, Dortch & Davis, Nashville, TN, Charles W. McElroy (argued and briefed), Boult, Cummings, Conners & Berry, Nashville, TN, Jeffrey A. Huth and Mark B. Cohen (briefed), McCarthy, Lebit, Crystal & Haiman, Cleveland, OH, for Defendant-Appellee in No. 96-5776.
 Byron R. Trauger, Gregory Mitchell (briefed), Doramus & Trauger, Nashville, TN, for Defendant-Appellee Fidelity Investments, Inc. in No. 96-5776.
 Before: MERRITT, WELLFORD, and BOGGS, Circuit Judges.
 BOGGS, J., delivered the opinion of the court, in which MERRITT, J., joined. WELLFORD, J. (pp. 295-96), delivered a separate concurring opinion.
 OPINION
 BOGGS, Circuit Judge.
 
 
 1
 This is a very complicated case, both procedurally and factually. The parties have contested it through at least five trial courts and three appellate courts, with vigor and venom. To assist the reader, I will preface the formal recitation of the facts with an over-simplified summary.
 
 
 2
 Robert Catz and Susan Chalker are (formerly) young lawyers (formerly) in love. They were married in 1980 in Washington, D.C. In 1989, Catz procured a divorce in Ohio. Chalker says she never knew about the divorce and was never served, though there is some evidence that she filed tax returns as a single person thereafter. In 1994, the couple moved to Arizona together. In late 1994, Chalker filed for divorce in Arizona. Now, it is Catz who says he did not timely learn of the divorce action and was not properly served. Ultimately, the Arizona court granted Chalker a divorce in March 1995. The direct question of the dueling decrees, however, is not before us.
 
 
 3
 Chalker got the Arizona courts to make a number of financial rulings very favorable to her: Catz's assets were frozen, all his financial assets were given to her, and Catz was forbidden to file any more papers or cases in several instances. Catz alleges that many of these rulings were procured by a variety of due process violations, including failure to serve him, failure to give him notice of court dates at which his rights were lost, and improper collusion and ex parte contacts between Chalker's lawyers and the Arizona judiciary. Catz could have attacked these actions by a timely appeal of the Arizona divorce action, by pursuing an initial plea of full faith and credit for the Ohio divorce judgment, or by other means. He did not.
 
 
 4
 The Arizona judgments became final and were not timely appealed. Instead, Catz tried to get into federal court, three or four times, but then let two direct federal actions be dismissed, one with prejudice and one without, and he never appealed these rulings to the Ninth Circuit. Instead, he began independent actions in federal district courts in Ohio and Tennessee, which is where our tale enters the Sixth Circuit. The basic question before us is whether the district courts in Tennessee and Ohio were correct in dismissing Catz's actions seeking declarations that he was deprived of both money and procedural rights, or whether his numerous procedural failures in Arizona have pretermitted any effort, at this late date, to sort out the varying actions and rights earlier adjudicated, in various ways, by the Ohio and Arizona state courts.
 
 
 5
 For the reasons described below, we affirm in part and reverse in part the judgment of the district court for the Northern District of Ohio, and reverse the judgment of the district court for the Middle District of Tennessee.[1]
 
 
 6
 * Preliminary Facts
 
 
 7
 Catz and Chalker, lawyers and former law professors, were married in 1980 and they had one child born of this marriage. On April 10, 1989, while Catz was living in Ohio and Chalker was living in Florida, Catz filed for divorce in Ohio. When Chalker did not answer, Catz was awarded a judgment of divorce by default. Chalker alleges that she was never served with the divorce summons and complaint because Catz sent them to a mailing address in Florida where they would be intercepted by Catz's friend and not delivered to her. She asserts that she did not learn of the Ohio divorce decree until late 1994. Whatever accounted for Chalker's absence, the Ohio court, after determining that the couple had not intermingled their personal property, awarded Catz his personal property located in Ohio and awarded Chalker her personal property then in her possession. (The judgment entry contained no mention of the financial assets now at issue.) The court declined to adjudicate custody of the child.
 
 
 8
 After the Ohio divorce decree, Catz and Chalker continued to see one another, and, according to Chalker, comported themselves as a married couple by applying as such for insurance and club memberships. Catz, however, alleges that during this period Chalker indicated that she was divorced on tax and student-loan forms. Whatever their marital status, in 1993 they moved to Arizona together.
 
 
 9
 On November 4, 1994, Chalker filed for divorce in the Pima County, Arizona, Superior Court, and on December 1, moved ex parte for a temporary restraining order barring the transfer of funds, claimed by her as community property, that were invested with entities including (to name those that are parties to the present actions) TIAA/CREF, Waterhouse Securities, and a number of mutual funds in the Fidelity group. In support of the motion, Chalker filed affidavits by herself and by a friend of the couple averring that Catz had vowed to put the assets out of Chalker's reach. The court granted Chalker's motion the same day the affidavits were filed.
 
 
 10
 Catz claims that he did not receive notice of Chalker's divorce action until December 14, 1994, over five weeks after it was filed and two weeks after the TRO. He then immediately filed an "emergency motion" to dismiss in the same court, on the grounds that the Ohio divorce decree, including its division of property, had to be given full faith and credit. Catz further alleged that the TRO freezing his assets would cause him severe hardship, including the destruction of his business as a concert promoter and bar owner, and render him unable to pay rent and other personal obligations.
 
 
 11
 The Arizona court initially scheduled a hearing on Catz's motion for December 19, 1994, but then--according to Catz, as a result of collusion between the court's chief judge and Chalker's counsel, a pro tempore judge of the court--continued the hearing until an undetermined date in 1995.
 
 
 12
 On December 19, Catz filed a notice of removal of the divorce action in the United States District Court for the District of Arizona, alleging federal jurisdiction based on the divorce action's purported collateral attack, on federal equal protection and due process grounds, on the Ohio divorce decree. On January 12, 1995, that federal court remanded the case to state court, reasoning that it was a domestic relations controversy over which it would be inappropriate to exercise federal jurisdiction. (On March 13, 1995, Catz filed a second notice of removal in the district court; the following day, the court remanded and ordered the clerk not to accept further pleadings from Catz without permission of the court.)
 
 
 13
 Also on December 19, 1994, Catz filed in the district court a § 1983 complaint ("the first Arizona federal action") alleging that Chalker's resonantly-named divorce attorneys, Annette Everlove and Leonard Karp, had deprived him of due process "by invoking the machinery of the State of Arizona to effect an ex parte seizure of his property after they were aware of the possible existence of a prior controlling state court judgment." Catz's complaint also alleged that Chalker and her lawyers had fraudulently concealed the existence of the Ohio divorce decree from the Arizona court. In April 1995, for reasons unexplained, Catz filed a notice of voluntary dismissal of this action.
 
 
 14
 On December 20, 1994, Catz separately filed, in the same court, an action ("the second Arizona federal action") against Chalker seeking a declaratory judgment that Chalker had been properly served in the Ohio divorce proceeding. This action also included a § 1983 claim against Chalker similar to the one alleged in the first Arizona federal action against Chalker's attorneys. On April 10, 1995, he filed a motion for voluntary dismissal without prejudice in the second action, too. Chalker, however, filed a brief in opposition, and the district court, adopting by reference the reasons stated in Chalker's brief, dismissed the case with prejudice on June 8, 1995.
 
 
 15
 Meanwhile, claiming that the freezing of his accounts had left him destitute and homeless, Catz left Arizona in early 1995 for Nashville, Tennessee, to take refuge with his sons, Shawn and Jason. Thus, he was not in Arizona during the remainder of the ongoing divorce proceedings in Pima County Superior Court. Catz claims that he sent a change of address form to that court, showing that he had moved to Nashville, but that the court refused to receive this form, which Catz suggests contributed to his receiving notices of deposition and hearing dates only after they occurred. After Catz failed to appear at a February 9, 1995 deposition, Chalker moved for sanctions. Catz claims that the hearing on that motion was held without notice to him. Nevertheless, the court found that Catz's failure to appear was part of a pattern of "unreasonable, groundless, abusive, or obstructionist conduct," held him in contempt, and barred him from filing further pleadings, answers, or from introducing evidence.
 
 
 16
 On March 14, 1995, the Pima County court, again with Catz absent, ruled that Catz had fraudulently obtained his Ohio divorce, and refused to give the Ohio divorce decree full faith and credit. In light of Catz's failure to appear, the court granted Chalker's petition of divorce by default. The decree awarded Chalker all the funds frozen by the TRO, $1,000 per month in maintenance, and $700 per month in child support. Catz submitted a motion to vacate these orders, but the clerk did not file his motion, and returned it to Catz only after the time to file a notice of appeal had expired. He attempted to file a special appeal, but the Arizona Court of Appeals declined to accept jurisdiction, and the Arizona Supreme Court denied leave to appeal. Catz filed a petition for certiorari with the United States Supreme Court, which was denied. Catz v. McDonald, --- U.S. ----, 117 S.Ct. 1433, 137 L.Ed.2d 540 (1997).
 
 II
 Case 96-3114 (Ohio Federal Action)
 
 17
 On July 27, 1995, Catz filed a complaint in the United States District Court for the Northern District of Ohio against Chalker and her attorneys, Karp and Everlove, and he sought a TRO against the financial institutions holding the assets awarded to Chalker by the Pima County court to bar them from disbursing those funds. The action sought a declaration that the Arizona divorce decree was void because it violated the Due Process Clause of the Fourteenth Amendment, the Full Faith and Credit Clause, and the Full Faith and Credit Act, 28 U.S.C. § 1738. (By contrast, the second Arizona federal action had sought a declaration, in effect, that the Ohio divorce decree was valid and that the Arizona divorce decree was therefore null and void, but alleged no due process violation in the Arizona proceeding itself.) The Ohio complaint also included a § 1983 count against Chalker and her attorneys similar to those alleged in the respective Arizona federal actions. The action also alleged violations of the Electronic Communications Act, 18 U.S.C. § 2511, and a number of supplemental claims under state law.
 
 
 18
 The court held a hearing on September 29, 1995, at which attorneys for Catz, Chalker, and the financial institutions appeared, although, according to the court, none of the defendants was ever properly served.[2] In colloquy, Judge Manos reviewed the proceedings in state and federal courts in Arizona, noting, among other things, that the request for a declaratory judgment and the § 1983 suit against Chalker had been dismissed with prejudice in the second Arizona federal action--an account with which Catz's attorney agreed. J.A. (I) at 74-75.[3]
 
 
 19
 Toward the close of the hearing, the court summarized its view of the case as follows:
 
 
 20
 Sir, I'm telling you I'm the Judge and you're not. There's no state action for which attorneys, who are licensed by the state to practice law, can be brought under an abridgement for constitutional rights under [section] 1983. Now, that's the law, and that's the same as to his wife.
 
 
 21
 Anyway, as to the wife, we have a decision by the District Court out there to which I look and say that's my brother court, and I accept that decision and that was decided with prejudice; the other was dismissed voluntarily without prejudice.
 
 
 22
 You're here now, and I'm dismissing it with prejudice; one reason of which is I don't have those people before me on the basis of in persona [sic]. You can't win that action.
 
 
 23
 . . . . .
 
 
 24
 This request for temporary restraining order is denied. The preliminary injunction hearing will not be set down. The whole case is dismissed with prejudice for the reason that this Court does not have in persona jurisdiction. There's a question as to venue and the allegations made are not before this Court [sic].
 
 
 25
 Anything further?
 
 
 26
 [The attorneys for Catz and Chalker responded in the negative.]
 
 
 27
 So ordered.... Call your client. It's being dismissed.
 
 
 28
 [Here, Catz's attorney noted plaintiff's exception to the ruling.]
 
 
 29
 J.A. (I) at 209-11.
 
 
 30
 More than two months later, on December 1, 1995, without any intervening filings by parties, the district court issued a memorandum and order dismissing the case with prejudice, on the stated grounds of improper venue, and Catz's failure to state a claim having "an arguable basis in law or fact because it is barred by res judicata." Manos op. at 9, J.A. (I) at 89. The court denied Catz's subsequent motion (to which the defendants responded with a brief) to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e).
 
 III
 
 31
 * We note, to begin with, that to the extent that the district court relied on improper venue as the basis for dismissal with prejudice, it was in error. Because venue is personal and waivable, a district court should not raise a venue objection on its own motion, absent extraordinary circumstances. Stich v. Rehnquist, 982 F.2d 88, 89 (2d Cir.1992). There is no indication in the docket sheet or in the transcript of the hearing that the defendants moved for dismissal for lack of venue. Even if they had done so, where there is a successful motion to dismiss for improper venue, dismissal is without prejudice. In re Hall, 939 F.2d 802, 804 (9th Cir.1991). In the discussion that follows, we will concentrate, therefore, on the other grounds furnished by the court, orally at the hearing, and in its written opinion.
 
 B
 
 32
 Appealing the dismissal,[4] Catz first argues that the district court erred in dismissing this case sua sponte without first notifying all parties of its intent to dismiss the action, as required by Tingler v. Marshall, 716 F.2d 1109 (6th Cir.1983).
 
 
 33
 In Tingler, we reiterated our view that sua sponte dismissals on the merits are disfavored, and exercised our supervisory power to establish a rule to govern such dismissals by the district courts. We held that
 
 
 34
 a district court faced with a complaint which it believes may be subject to dismissal must: (1) allow service of the complaint upon the defendant; (2) notify all parties of its intent to dismiss the complaint; (3) give the plaintiff a chance to either amend his complaint or respond to the reasons stated by the district court in its notice of intended sua sponte dismissal; (4) give the defendant a chance to respond or file an answer or motions; and (5) if the claim is dismissed, state its reasons for the dismissal.
 
 
 35
 716 F.2d at 1112.
 
 
 36
 In its memorandum of opinion, the district court correctly recited this rule, and stated that "[a]t the conference ... the court notified all parties of its intent to dismiss, and it heard arguments of Catz. It also permitted the defendants to respond. The defendants have not answered or filed any motions."
 
 
 37
 Although the defendants here were apparently never formally served, the first part of the Tingler rule presented no obstacle to the court's sua sponte dismissal. In Morrison v. Tomano, 755 F.2d 515, 517 (6th Cir.1985) (per curiam), we held that "a sua sponte dismissal for failure to state a claim is not necessarily rendered invalid because of lack of service on the defendant or failure to provide the defendant an opportunity to respond." Unlike the case at bar and Tingler, the district court in Morrison dismissed the case without prejudice. However, plaintiff interests are usually considered under the third part of the Tingler rule, as discussed below. In Morrison, we noted the rationale in Tingler for the parts of the rule implicating the defendant--that is, service of the complaint, notice of the intent to dismiss, and opportunity to respond to the complaint.
 
 
 38
 [I]n the context of a dismissal on the merits ... if the dismissal were appealed, the defendant might be handicapped on appeal by having lost the opportunity to create a record of factual issues.... Failure to notify a defendant of a complaint which is to be dismissed for failure to state a claim does not invoke the same concerns, since a factual record is of little use on the appeal of such a dismissal. The legal arguments which counsel would make in arguing to affirm the dismissal would require no factual underpinning.
 
 
 39
 755 F.2d at 517.
 
 
 40
 Similar reasoning pertains here. Whether attorneys may be deemed state actors liable under § 1983 by virtue of their status as officers of the court is purely a legal question not requiring development of a factual record. Appellate review of dismissal on the grounds of res judicata does, by contrast, require a factual underpinning: documents establishing the claims and issues actually litigated and necessarily determined in the previous action. These facts, however, need not be separately established by the defendant in the district court in the subsequent action sought to be barred, but will ordinarily be available through judicial notice of court documents. See FED.R.EVID. 201.
 
 
 41
 In addition, we also note that in Tingler, the district court dismissed the complaint on the day it was filed, so there scarcely was any chance for the defendant to be served. Here, dismissal occurred months after the complaint was filed, and the defendants, whose attorneys appeared specially at the hearing, obviously knew about the complaint. This circumstance mitigates any unfairness to the defendants, and indeed, they have not objected to the dismissal.
 
 C
 
 42
 The district court's treatment of the second and third parts of Tingler are problematic. The court orally announced the dismissal with prejudice at the September 29 hearing, but did not issue its written order and explanatory opinion until December 1. In asserting that it complied with Tingler, the court construed its words at the hearing as notice of its intent to dismiss, and presumably believed that Catz then had the opportunity to contest the court's reasoning or to amend his complaint. However, the transcript of the hearing suggests that someone in Catz's position could reasonably have believed that the district court dismissed the complaint then and there. "So ordered," Judge Manos stated; those words, rather than inviting a response, clanged with the finality of a decision already rendered. A plaintiff in such a situation might reasonably believe that any written order of dismissal would issue forthwith; Catz certainly could not have known that he would have two months in which to respond to the sua sponte motion.
 
 
 43
 As demanded by general concepts of fairness, and in light of the fact that the rule in Tingler is a rather grudging allowance of a judicial practice that is generally disfavored, a district court's notice of its intent to dismiss sua sponte should be unmistakable (whether oral or written), and should specify a date by which the parties must respond to the court's motion, giving them reasonable time under the circumstances to do so. (For an example of one proper approach, see United Brotherhood of Carpenters and Joiners of America v. Ohio Carpenters Health and Welfare Fund, 926 F.2d 550, 552, 557-58 (6th Cir.1991) (approving district court's sua sponte dismissal of complaint after it issued order for plaintiff to show cause within fifteen days why complaint should not be dismissed for failure to state a claim)). Such practice is necessary for Tingler 's notice requirement to be meaningful, and we now explicitly hold that Tingler requires the district court to give unambiguous notice of its own motion to dismiss, and to notify the parties of a reasonable date by which they must respond. Because the district court did not provide notice and an effective opportunity to respond, as required by Tingler, we hold that its sua sponte dismissal with prejudice was error.
 
 D
 
 44
 In a similar situation, this court has opted not to remand the case to the district court, but rather to decide the case itself on the merits. See Salibra v. Supreme Court of Ohio, 730 F.2d 1059, 1062 (6th Cir.) ("In Tingler we criticized sua sponte dismissals on the merits as being ultimately wasteful of judicial resources. In the interest of conservation of those resources we now address the merits of Salibra's case."), cert. denied, 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984). After considering whether the record has been sufficiently developed below to allow us to proceed in similar fashion, we conclude that it has.[5] Here, as in Salibra, the salient issues "involve solely questions of law, fully reviewable by this court." Ibid. Therefore, we proceed to our own determination of whether the Ohio case, on appeal as No. 96-3114, should have been dismissed.[6]
 
 
 45
 * The Effect of the Dismissal with Prejudice
 
 
 46
 In the second Arizona federal case, in which Chalker was the sole defendant, Catz moved for dismissal without prejudice by leave of the court, pursuant to Federal Rule of Civil Procedure 41(a)(2). Chalker responded by asking the court to dismiss with prejudice. She argued that:
 
 
 47
 Rule 41(a)(2), Federal Rules of Civil Procedure, provides that this court may dismiss Plaintiff's action upon such terms and conditions as it deems proper. Rule 1, supra, as amended, requires federal courts to construe and administer the rules to secure the just, speedy and inexpensive determination of every action. Rule 41, applied in conjunction with Rule 1, requires this court to dismiss Plaintiff's lawsuit with prejudice in order to halt Plaintiff's abusive use of the federal legal system to intimidate the Defendant, and to avoid further frivolous filings by Plaintiff.
 
 
 48
 J.A. (II) at 533.
 
 
 49
 The answer then recounted conduct that Chalker said "illustrates that [Catz] is using both federal and state court processes to abuse and harass the Defendant rather than to secure the just determination of any valid legal dispute." The district court granted Chalker's motion, "for the reasons contained in Defendant's Response." Catz v. Chalker, No. CIV 94-879 TUC ACM (D. Ariz. June 8, 1995) (order dismissing case with prejudice), J.A. (II) at 536.[7] Catz did not appeal the district court's order.
 
 
 50
 We need not, and indeed cannot, reach the question of whether the district court in Arizona was correct in adopting the reasons furnished by Chalker in her response to Catz's motion to dismiss without prejudice. The fact is that the court did adopt those reasons, and grounded its dismissal with prejudice thereon. Catz had the opportunity to appeal that dismissal, which he did not do, and the dismissal with prejudice became final.
 
 
 51
 A dismissal of a suit with prejudice bars a subsequent action seeking the same relief. England v. Automatic Canteen Co. of America, 349 F.2d 988 (6th Cir.1965). Further, the law of preclusion bars a plaintiff from bringing, in a subsequent action, new allegations relating to the same underlying facts that could have been brought in the former action against the defendant. See RESTATEMENT (SECOND) OF JUDGMENTS § 24(1). Federal courts observe this traditional rule of preclusion, see Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980); Cromwell v. County of Sac, 94 U.S. (4 Otto) 351, 352, 24 L.Ed. 195 (1876), unless a state court issued the prior judgment, in which case it will be treated according to that state's law of preclusion. See Migra v. Warren City School Dist., 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984).
 
 
 52
 However, some aspects of Catz's Fourteenth Amendment claims in the present cases involve alleged irregularities in the Pima County Superior Court proceedings that either had not yet transpired; or had not been discovered on December 19, 1994, when Catz filed his complaint against Chalker in the second Arizona federal action; or even had not been discovered by April 10, 1995, when Catz moved to dismiss. The dismissal with prejudice of that case cannot bar a successive action based on such circumstances. For instance, Catz alleges a due-process violation in the failure of the Pima County court clerk to file the motions for post-judgment relief that Catz mailed on March 29, 1995, and in the fact that the clerk delayed so long in mailing the unfiled motions back to Catz that the time for direct appeal lapsed before he received them on April 14, 1995. Also, it would appear that Catz did not discover the alleged "clandestine, ex parte " meeting between Chalker's attorney, Karp, and the chief judge of the Pima County Superior Court on December 16, 1994, until Karp filed an application for attorney fees on May 5, 1995, in which Karp itemized that meeting as billable time.[8]
 
 
 53
 As already noted, Catz alleges that, as a result of some of the irregularities complained of, he was unable to file a timely direct appeal of the divorce decree in the Arizona courts. Though he sought to press these issues before the Arizona appellate courts by means of a special action, see 17B A.R.S. Special Actions, Rules of Proc., Rule 8, those tribunals declined to accept jurisdiction. See Catz v. McDonald, No. CA-SA 96-0051 (Ariz.Ct.App.), pet. for rev. denied, No. CV-96-0358-PR (Ariz.Sup.Ct.), cert. denied, --- U.S. ----, 117 S.Ct. 1433, 137 L.Ed.2d 540 (1997). It appears that under Arizona law an appellate court's refusal to accept jurisdiction over a special action does not constitute a judgment on the merits. See Lavello v. Wilson, 150 Ariz. 235, 722 P.2d 962, 963 n. 1 (App.1985); Morgan v. Continental Mortgage Investors, 16 Ariz.App. 86, 491 P.2d 475, 478 (1971).
 
 
 54
 Defendants, however, point out that although the time for filing an appeal of the Pima County divorce decree expired, Catz still had the opportunity to file a motion for post-judgment relief under Arizona Rule of Civil Procedure 60. We must look to Arizona's law of preclusion to determine whether Catz's failure to avail himself of the opportunity to litigate issues in a Rule 60 motion now precludes a collateral action involving those issues. See Migra v. Warren City School Dist., 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). By its own terms, Rule 60 does not so operate.[9] As Catz points out, the Arizona Supreme Court has held that Rule 60(c) allows a new cause of action in equity to set aside a judgment on grounds given in the rule. Morrison v. McCarrell, 80 Ariz. 243, 295 P.2d 1088, 1091 (1956). Further, the same court has recognized that a judgment entered in violation of due process of law may be void. See Phoenix Metals v. Roth, 79 Ariz. 106, 284 P.2d 645, 648 (1955). And there is no time limit in which relief from a void judgment or order must be sought. Martin v. Martin, 182 Ariz. 11, 893 P.2d 11, 14 (App.1994).
 
 
 55
 Consequently, we conclude that neither the dismissal with prejudice by the court in the second Arizona federal action, nor the judgment of the Pima County Superior Court, precludes a separate, subsequent claim raising the Fourteenth Amendment allegations raised here that occurred or were discovered after April 10, 1995. However, the dismissal with prejudice in the second Arizona federal action did bar future claims that were, or could have been, litigated therein: for example, the validity of the 1989 Ohio divorce action, the claim that the Pima County judgment violated the Full Faith and Credit Act, the § 1983 suit against Chalker, or the Electronic Communications Act count (which was not included in the second Arizona federal action, but could have been, as it was based on events occurring in October and November of 1994, before the filing of the complaint).
 
 2
 
 56
 The § 1983 and § 1985 Claims Against Chalker's Attorneys
 
 
 57
 At the September 29, 1995 hearing, Judge Manos emphatically rejected the claim that Chalker's attorneys were state actors against whom an allegation of deprivation of constitutional rights under color of law could be properly lodged. He was correct in so concluding. See Polk County v. Dodson, 454 U.S. 312, 318, 102 S.Ct. 445, 449-50, 70 L.Ed.2d 509 (1981); Bilal v. Kaplan, 904 F.2d 14, 15 (8th Cir.1990); Lindley v. Amoco Production Co., 639 F.2d 671, 673 (10th Cir.1981); Cooper v. Wilson, 309 F.2d 153, 154 (6th Cir.1962); Kenney v. Fox, 232 F.2d 288, 289 (6th Cir.1956). Although the district court's written order did not repeat the decision orally announced on this score, we now dismiss with prejudice Catz's claims against Chalker's attorneys under § 1983 and § 1985 for failure to state a claim upon which relief could be granted. FED.R.CIV.P. 12(b)(6).
 
 
 58
 Therefore, the dismissal with prejudice by the district court in No. 96-3114 is AFFIRMED in part and REVERSED in part.[10] Catz's only claim to survive that action, as well as the second Arizona federal action, is his contention that actions of the Pima County Superior Court taken or discovered subsequent to April 10, 1995, were in contravention of his due process rights under the Fourteenth Amendment.
 
 IV
 
 59
 Case No. 96-5776 (Tennessee Federal Action)
 
 
 60
 We turn now to No. 96-5776, the appeal from Catz's action in the Middle District of Tennessee. There, on the basis of the same facts as alleged in the Ohio action, Catz sought "a final declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Arizona state court judgment is invalid under 28 U.S.C. § 1738, Article IV § 1 of the United States Constitution, and the due process clause of the Fourteenth Amendment to the United States Constitution." He invoked both federal question (by virtue of his Fourteenth Amendment claim) and diversity jurisdiction.
 
 
 61
 We begin by noting that, just as the dismissal with prejudice of the second Arizona federal case barred all but a part of the action in the Northern District of Ohio, that dismissal also operates to bar such claims in the Tennessee case, and in any and all future actions. Here, then, only Catz's count seeking a declaratory judgment that the Arizona state court judgment was entered in violation of the due process clause of the Fourteenth Amendment retains potential vitality.
 
 
 62
 After carefully reviewing the case's procedural history and Catz's factual allegations, the district court dismissed the lawsuit for lack of subject-matter jurisdiction.[11] It based this determination on two separate theories: the domestic relations exception to federal jurisdiction, and the Rooker-Feldman doctrine. We examine these in turn.
 
 A. Domestic Relations Exception
 
 63
 The district began by noting "that federal courts have declined to exercise jurisdiction over domestic matters where jurisdiction is based on diversity," and that the same principle has been applied to federal question jurisdiction. The court cited numerous cases that set forth these concepts, among them Firestone v. Cleveland Trust, 654 F.2d 1212 (6th Cir.1981), where we discussed the theory as follows:
 
 
 64
 Although a domestic relations case may meet the technical requirements for diversity jurisdiction, federal courts traditionally have refrained from exercising jurisdiction over cases which in essence are domestic relations disputes. Even when brought under the guise of a federal question action, a suit whose substance is domestic relations generally will not be entertained in a federal court.
 
 
 65
 Valid reasons have been given in support of federal courts abstaining from exercising jurisdiction over domestic relations cases. The field of domestic relations involves local problems "peculiarly suited to state regulation and control, and peculiarly unsuited to control by federal courts." "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states and not to the laws of the United States." Because state courts historically have decided these matters, they have developed a proficiency and expertise in these cases and a strong interest in disposing of them. Some states now have specialized courts which adjudicate only domestic relations cases and are better suited to process the large volume of such cases.
 
 
 66
 . . . . .
 
 
 67
 [When considering whether to abstain in a domestic relations case, it] is incumbent upon the district court to sift through the claims of the complaint to determine the true character of the dispute to be adjudicated. The mere obtaining of a divorce decree, without more, does not remove the case from the arena of domestic relations and permit the intervention of federal courts to adjudicate issues unaffected by the decree.
 
 
 68
 Id. at 1215-16 (citations omitted).
 
 
 69
 Although that sounds clear enough, in truth the domestic relations exception to federal jurisdiction is not the most coherent of doctrines. Such might be expected from the incongruous bases on which it stands: unsupported dictum in the majority opinion,[12] and losing arguments in the dissent,[13] in the case of Barber v. Barber, 62 U.S. (21 How.) 582, 16 L.Ed. 226 (1858). In its sporadic revisitations of the doctrine, the Supreme Court endowed it with varying degrees of force, and justified it with an assortment of rationales, some constitutional, some prudential, and some statutory. See generally Michael Ashley Stein, The Domestic Relations Exception to Federal Jurisdiction: Rethinking an Unsettled Federal Courts Doctrine, 36 B.C.L. REV. 669 (1995). Not surprisingly, the lower courts have disagreed on the precise nature of this doctrine. Application has been particularly variegated because courts face so many different questions under the heading of "domestic relations," including the declaration of marital and parental statuses, assignment of rights and obligations pertaining to those statuses, enforcement of those rights and obligations, adjudications of torts alleged to have been committed in connection with those rights, and adjudication of constitutional affronts in connection with the declaration of status or with awarded rights. See id., 62 U.S. (21 How.) at 669-70. While the federal courts have almost unanimously invoked the doctrine to the "core" issue of declaring marital or parental status, "[b]eyond this initial agreement ... the approach taken by federal courts to non-core actions may most charitably be described as chaotic." Id., 62 U.S. (21 How.) at 679.
 
 In our case, the district court held:
 
 70
 In the present case, the gravamen of Plaintiffs' claim is that they were denied due process during the Arizona Court's proceedings, which led to the divorce decree of March 14, 1995. Although Plaintiffs have characterized their claims as alleged constitutional violations, the relief sought is to void the Arizona state court decrees mentioned above, which, among other things, voided a prior Ohio divorce decree, granted a separate divorce, along with child custody, alimony and child support to Defendant Chalker, and transferred his assets to her. Said relief directly implicates the aforementioned principles of comity. Plaintiffs request that the Court declare the dissolution decree entered by the Arizona Court invalid. Any such finding by this Court would necessarily involve the Court in the core of a domestic relations dispute between husband and wife seeking to obtain a declaration of their marital status, a declaration of rights or obligations arising from said marital status, and to enforce that declaration of status, rights, or obligations. This Court's adjudication of [Plaintiff's] claims will directly impact the marriage status and rights between the husband Plaintiff and his wife.... Traditionally, marriage, divorce, child custody, support payments and division of marital assets are uniquely state matters which involve distinct issues of state law.
 
 
 71
 The potential for impermissible interference in state domestic matters is particularly strong under the facts of this case because any ruling by the Court would necessarily affect the Arizona state court custody determination.
 
 
 72
 Mem. Op. at 8-9.
 
 
 73
 Our disagreement with the district court comes down to the question of whether Catz's action is a "core" domestic relations case, seeking a declaration of marital or parental status, or a constitutional claim in which it is incidental that the underlying dispute involves a divorce. We conclude that the case is best described as the latter. True, the remedy Catz seeks--a declaration that the Pima County divorce decree is void as a violation of due process--would seem to "directly impact the marriage status and rights between the husband Plaintiff and his wife." On the other hand, if the divorce judgment were unconstitutionally obtained, it should be regarded as a nullity, see Phoenix Metals Corp. v. Roth, 79 Ariz. 106, 284 P.2d 645, 648 (1955), and any decree so stating would change nothing at all. Further, the declaration Catz seeks would not itself address the merits, or ultimately dispose, of Chalker's divorce petition; she would be free to relitigate her marital status in state court. Finally, Catz is not asking the district court to involve itself in the sort of questions attendant to domestic relations that are assumed to be within the special expertise of the state courts--for instance, the merits of a divorce action; what custody determination would be in the best interest of a child; what would constitute an equitable division of property; and the like. Instead, Catz asks the court to examine whether certain judicial proceedings, which happened to involve a divorce, comported with the federal constitutional guarantee of due process. This is a sphere in which the federal courts may claim an expertise at least equal to that of the state courts.
 
 
 74
 Our conclusion that the domestic relations exception ought not to apply here finds support in the Supreme Court's latest announcement on the subject, Ankenbrandt v. Richards, 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). There, the Court (impressed that the doctrine's pedigree, though dubious, was certainly very old; and supposing that the jurisdictional limit had been ratified by Congressional silence) reaffirmed the existence of the doctrine, but gave it narrow scope:
 
 
 75
 We conclude, therefore, that the domestic relations exception, as articulated by this Court since Barber, divests the federal courts of power to issue divorce, alimony, and child custody decrees....
 
 
 76
 By concluding, as we do, that the domestic relations exception encompasses only cases involving the issuance of a divorce, alimony, or child custody decree, we necessarily find that the Court of Appeals erred by affirming the District Court's invocation of this exception. This lawsuit in no way seeks such a decree; rather, it alleges that respondents ... committed torts against ... Ankenbrandt's children.... Federal subject-matter jurisdiction pursuant to § 1332 thus is proper in this case.
 
 
 77
 Id. at 703-04, 112 S.Ct. at 2215. The Court also noted that "[t]he better reasoned views among the Courts of Appeals have similarly stated the domestic relations exception as narrowly confined to suits for divorce, alimony, or child custody decrees." Id. at 703 n. 6, 112 S.Ct. at 2215 n. 6.
 
 
 78
 We take this language to mean, plainly enough, that the domestic relations exception applies only where a plaintiff positively sues in federal court for divorce, alimony, or child custody.[14] This is simply not such a lawsuit. Nor is it made so by the fact that the suit, if successful, would alter the parties' status, rights, and obligations, as they had been most recently determined by the Pima County court. (The district court distinguished Ankenbrandt by reasoning that the plaintiff's claim in that case would have had no such effect; we do not think this factual distinction avoids the clear language of Ankenbrandt.) Therefore, we cannot accept the first basis offered by the district court for refusing to assume jurisdiction.[15]B. Rooker-Feldman Doctrine
 
 The district court next held that:
 
 79
 [i]n addition to the fact that the domestic relations exception and the accompanying comity principles warrant dismissal, it is clear that the Court does not have jurisdiction under the Rooker-Feldman doctrine, [which] was developed from two Supreme Court cases, Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In each case, the Supreme Court considered whether a federal district court could exercise jurisdiction to determine the validity of a state court judgment. The Supreme Court held federal district courts "do not have jurisdiction ... over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in [the United States Supreme Court]." Feldman, 460 U.S. at 486, 103 S.Ct. at 1317 (citing 28 U.S.C. § 1257).
 
 
 80
 Mem. Op. at 12 (alterations in original).
 
 
 81
 The court analyzed two elements implicated in the potential operation of this jurisdictional rule. First, "[i]n order for the Rooker-Feldman doctrine to apply to a claim presented in federal district court, the issue before the Court must be ['inextricably intertwined'] with the claim asserted in the state court proceeding." Mem. Op. at 14 (citing Keene Corp. v. Cass, 908 F.2d 293, 296 (8th Cir.1990)). The Keene decision goes on to say:
 
 
 82
 Under the Feldman doctrine,
 
 
 83
 the federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.
 
 
 84
 908 F.2d at 296-97 (quoting Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 25, 107 S.Ct. 1519, 1533, 95 L.Ed.2d 1 (1987))(Marshall, J., concurring).
 
 
 85
 The second element is the requirement that the action brought in the district court be a "general challenge" to the constitutionality of the state law applied in the state action, rather than a "specific grievance" that the law was invalidly--even unconstitutionally--applied in the plaintiff's particular case. This element is found in Feldman, where the plaintiff challenged as unconstitutional the District of Columbia's rules for admission to the bar. The Court discussed
 
 
 86
 the distinction between general challenges to state bar admission rules and claims that a state court has unlawfully denied a particular applicant admission. We have recognized that state supreme courts may act in a non-judicial capacity in promulgating rules regulating the bar.... Challenges to the constitutionality of state bar rules, therefore, do not necessarily require a United States District Court to review a final state court judgment in a judicial proceeding. Instead, the District Court may simply be asked to assess the validity of a rule promulgated in a non-judicial proceeding. If this is the case, the District Court is not reviewing a state court judicial decision. In this regard, 28 U.S.C. § 1257 does not act as a bar to the District Court's consideration of the case and because the proceedings giving rise to the rule are non-judicial the policies prohibiting United States District Court review of final state court judgments are not implicated. United States District Courts, therefore, have subject matter jurisdiction over general challenges to state bar rules, promulgated by state courts in non-judicial proceedings, which do not require review of a final state court judgment in a particular case. They do not have jurisdiction, however, over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in this Court. 28 U.S.C. § 1257.
 
 
 87
 460 U.S. at 485-86, 103 S.Ct. at 1316-17 (emphasis added).
 
 
 88
 The district court found that Catz's claim was both inextricably intertwined with the judgment of the Pima County Superior Court in Chalker's divorce action, and was a specific grievance, rather than a general challenge, to any state law implicated therein.
 
 
 89
 In our view, the district court erred in holding that Catz's lawsuit (at least the due-process claims that survive the claim preclusion effect of the judgment in the second Arizona federal case, as discussed in Part III, supra ) is inextricably intertwined with the Arizona divorce judgment. Catz's due process allegation does not implicate the merits of the divorce decree, only the procedures leading up to it.[16] For him to seek federal relief on this score need not be "predicated upon a conviction that the state court was wrong" on the merits. Keene, supra, at 297. And, as we pointed out above, relief for Catz's due-process claim would not consist of a conflicting judgment on the merits; if the court were to declare the Pima County decision void as having been secured in violation of due process, that would not itself prevent Chalker from resuming or refiling her divorce action, nor prevent the Pima County Court from coming to the same conclusion under constitutional procedures.
 
 
 90
 We agree with the district court, however, that Catz's lawsuit is a specific grievance, rather than a general challenge. His complaint alleges:
 
 
 91
 The manner in which the Arizona state court proceeding was conducted, resulting in a coerced and involuntary entry of the final decree of dissolution by default, deprived the Plaintiffs of a full and fair opportunity to be heard on all claims adjudicated on March 14, 1995, and resulted in the taking and transfer of accounts in the custody and possession of Defendant financial institutions and titled in the name of Plaintiffs by denying them an opportunity to be heard. Furthermore, Plaintiffs, Shawn D. Catz and Jason A. Catz, were never named or joined as parties in the Arizona proceeding, served with a summons and complaint, a temporary restraining order, or the final judgment awarding assets titled to them to Defendant Chalker.
 
 
 92
 Amended Compl. p 14.
 
 
 93
 Nowhere in the complaint does Catz make a general constitutional challenge to any specific Arizona law or rule of procedure; he simply attacks as unconstitutional "the manner in which the Arizona state court proceeding was conducted" (emphasis added). However, we believe that the cases stating that, to avoid the reach of the Rooker-Feldman doctrine, a case must represent a "general challenge" rather than a "specific grievance" do so in the context of a direct attack on the substance of the state court decision. Here, the claims that survive claim preclusion, as outlined above, are directed to the procedures used by the Arizona court, procedures that Judge Echols found, if true, to be "shocking". (J.A. (II) at 154 n.7). Thus, permitting jurisdiction in this case does not contravene the heart of the Rooker-Feldman doctrine, the prohibition of reviewing the substance of state court judgments. See Sun Valley Foods Co. v. Detroit Marine Terminals, Inc., 801 F.2d 186, 188-89 (6th Cir.1986). There, we noted that although a district court
 
 
 94
 "has no authority to review final judgments of a state court in judicial proceedings," Feldman, 460 U.S. at 482[, 103 S.Ct. at 1315], ... [a] federal court "may entertain a collateral attack on a state court judgment which is alleged to have been procured through fraud, deception, accident, or mistake...." Resolute Insurance Co. v. State of North Carolina, 397 F.2d 586, 589 (4th Cir.1968).
 
 
 95
 Sun Valley, 801 F.2d at 189. See also Lewis v. East Feliciana Parish Sch. Bd., 820 F.2d 143, 146 (5th Cir.1987) (due process challenge to state proceedings not barred by Feldman doctrine, though res judicata may apply).
 
 
 96
 The Supreme Court also recently tiptoed around the edges of the doctrine in Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1. The Second Circuit, 784 F.2d 1133, 1144 (2d Cir.1986), had held that Rooker does not bar a federal court from exercising jurisdiction over claims that certain state provisions "deny Texaco due process and equal protection as applied. Those claims have never been presented to or adjudicated by a state court. Nor are they 'inextricably intertwined' with the barred claims." Once the claims that are barred by claim preclusion are excised from this case, exactly the same can be said of Catz's challenge here. The Supreme Court did not specifically rule on the Second Circuit's holding, although it was supported in a series of individual concurrences. See 481 U.S. at 18, 107 S.Ct. at 1529-30 (Justices Scalia and O'Connor); id. at 21, 107 S.Ct. at 1531 (Justices Brennan and Marshall); id. at 27-28, 107 S.Ct. at 1534-35 (Justice Blackmun); id. at 31 n. 3, 107 S.Ct. at 1536 n. 3 (Justices Stevens and Marshall). See RICHARD H. FALLON, JR., ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1504 (4th ed. 1996) ("[A] majority of the Justices explicitly rejected" Pennzoil's argument that "the rationale of the Rooker-Feldman doctrine, properly understood, denied the lower federal courts any authority to displace state courts....").
 
 
 97
 In particular, as Justice Marshall stated, 481 U.S. at 25, 107 S.Ct. at 1533, "[w]here federal relief can only be predicated upon a conviction that the state court was wrong" a federal proceeding would be a prohibited appeal. However, the narrow remaining claims of the alleged procedural violations of Catz's constitutional rights do not rest on any substantive wrongness of the rulings of the Arizona courts, and the Rooker-Feldman doctrine does not bar the maintenance of this action.
 
 
 98
 We therefore REVERSE the judgment of the United States District Court for the Middle District of Tennessee, and REMAND for further proceedings not inconsistent with this opinion.
 
 
 99
 WELLFORD, Circuit Judge, concurring.
 
 
 100
 I designate this brief separate opinion as a concurring opinion because I am in basic agreement with the disposition of these complex and complicated matters by Judge Boggs.
 
 
 101
 My disagreement is not in our affirming district Judge Manos' dismissal of case No. 96-3114 (the Ohio federal action), but I believe and would hold that the dismissal should have been without prejudice. The majority agrees that defendants were never served in that case, and Morrison v. Tomano, 755 F.2d 515, 517 (6th Cir.1985), counsels that the action should have been dismissed but without prejudice as does Fed.R.Civ.P. 4(j), which "requires the plaintiff to have the summons and complaint served upon the defendant within 120 days after the action is filed...." Wright & Miller, Federal Practice and Procedure, Vol. 4A, § 1137. The normal procedure would be dismissal without prejudice for plaintiffs' failure in this respect. Id. "Rule 4(m), as amended in 1993, retains much of the language of Rule 4(j)." Id. The language of the Rule is that the district court "shall dismiss ... without prejudice" the complaint if no extension is granted. None was allowed in this case.
 
 
 102
 Citing cases from a number of circuits, the Seventh Circuit held, in this regard, "under Rule 4(m), the court had discretion to dismiss without prejudice, or extend the time for service...." Panaras v. Liquid Carbonic Indus., 94 F.3d 338, 340 (7th Cir.1996). The district court neither found good cause to extend nor any reason to extend Catz's time for service of process; in my view, it should therefore have dismissed without prejudice. Again, absent good cause for failure to serve in a timely manner under the Rule, "the court may, in its discretion, either dismiss the action without prejudice, or direct that service be effected within a specified time. Rule 4(m); see Henderson v. United States, 517 U.S. 654, 661-63, 116 S.Ct. 1638, 1643, 134 L.Ed.2d 880 (1996)." Id. (emphasis added).
 
 
 103
 The majority concedes, moreover, that the district court's treatment of the dismissal process under Tingler v. Marshall, 716 F.2d 1109 (6th Cir.1983), was "problematic." The district judge conceded that plaintiffs had obtained no in personam jurisdiction over defendants and that there was "a question as to venue" before announcing a dismissal with prejudice. I believe the Ohio district court abused its discretion in not dismissing without prejudice. See Byrd v. Stone, 94 F.3d 217 (6th Cir.1996).
 
 
 
 [1]
 Appellees have requested the use of this court's inherent powers to control what they see as abusive tactics by the Appellants and to prevent any further litigation. As we have determined that it is necessary to reverse certain parts of both judgments, the exercise of such powers would be inappropriate at this time. However, these remands are without prejudice to the ability of the district courts to exercise their powers on remand with regard to sanctions
 
 
 [2]
 Catz asserts that Karp and Everlove were served on September 27, 1995, but acknowledges that he did not submit proof of service to the court. At the hearing, Judge Manos noted possible problems with personal jurisdiction, and those matters may be raised on remand
 
 
 [3]
 The "Consolidated Joint Appendix" consists of one volume for appeal No. 96-3114, which I will refer to as "J.A. (I)," and two consecutively paginated volumes for appeal No. 96-5776, which I will refer to as "J.A. (II)."
 
 
 [4]
 In this appeal, Catz has filed a pro se brief. In No. 96-5776 (the Tennessee action), his counsel submitted briefs
 
 
 [5]
 In the case at bar, the district court ruled as follows:
 The complaint does not have an arguable basis in law or fact because it is barred by res judicata. Catz entered an appearance in the Arizona state case and filed the second Arizona federal case. Judgments were rendered on the merits in both cases. His opportunities to attack them ended when he did not appeal.... His claims in the above captioned case are identical to ones previously raised and decided.... Therefore, he is not entitled to relief.
 J.A. (I) at 89.
 Catz argues in his brief that "the district court's order of dismissal with prejudice finding the action barred on grounds of res judicata is clearly erroneous, as there is nothing in the record before this Court to permit it to sustain that factual and legal conclusion reached by the district court." However, the portions of the record of the second Arizona federal action that are necessary for us to determine the validity of the finding of res judicata are included in the record before us.
 
 
 [6]
 In doing so, we do not repeat the error of failing to give the parties notice of the proposed sua sponte dismissal. Salibra puts parties on notice that the court of appeals may choose to rule. That precedent, together with a lawyer's common sense, suggests that a party appealing a district court's sua sponte dismissal would almost certainly address the merits of the ruling, and not merely whether the district court adhered to the formal elements of the Tingler rule; indeed, Catz has done so. The Tingler requirement that the plaintiff be permitted to amend his complaint to avoid dismissal on the court's own motion could, where such a curative amendment was possible, render inappropriate a decision on the merits by the court of appeals. We see no such possibility here
 
 
 [7]
 Catz states--misleadingly--that the dismissal with prejudice was "for want of a federal question under Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); Louisville & Nashville Railroad v. Motley [sic], 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908)." That was the argument Catz presented to the Arizona district court in support of his motion for dismissal without prejudice, but it was not the very different argument contained in Chalker's response and adopted by the district court
 
 
 [8]
 The time sheet charges 1.40 hours of Leonard Karp's time for "Telephone conference with A. Everlove (x2); Conference with Judge Alfred and secretary; Instructions to B. Bremiller." J.A. (II) at 140
 
 
 [9]
 Rule 60(c) states:
 On motion and upon such terms as are just the court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(d); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged, or a prior judgment on which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be filed within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment or order was entered or proceeding was taken. A motion under this subdivision does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding, or to grant relief to a defendant served by publication as provided by Rule 59(j) or to set aside a judgment for fraud upon the court. The procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.
 
 
 [16]
 A.R.S. Rules of Civil Procedure, Rule 60(c)
 
 
 [10]
 Catz also argues that the district court should have dismissed the action without prejudice because personal service was not made on Chalker and other indispensable parties within 120 days of the filing of the complaint. See FED.R.CIV.P. 4(m) (formerly Rule 4(j)). It is certainly true that, "[a]bsent a showing of good cause to justify a failure to effect timely service, the Federal Rules of Civil Procedure compel dismissal." Byrd v. Stone, 94 F.3d 217, 219 (6th Cir.1996). In Catz's view, Rule 4(m) not only compels dismissal without prejudice if 120 days elapse without service, but also preempts any other action by the district court grounded on independent bases. We disagree with that reading. The language of the rule implies that the district court has enough flexibility to make some other disposition of the case, as may be warranted by earlier proceedings
 
 
 [11]
 Defendants also sought dismissal on the basis of lack of personal jurisdiction. As with the Ohio action (see n. 2, supra ), defendants are free to raise this defense on remand
 
 
 [12]
 "We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony...." 62 U.S. (21 How.) 582, 584, 16 L.Ed. 226 (1858)
 
 
 [13]
 The three dissenters argued that federal courts lacked jurisdiction over domestic relations matters because, in the English judicial model supposedly followed by the Framers, the ecclesiastical courts, rather than the chancery courts, held such jurisdiction. 62 U.S. (21 How.) at 605 (Daniel, J., dissenting). They further argued that it was not the business of the federal government to "assume to regulate the domestic relations of society [or to] with a kind of inquisitorial authority, enter the habitations and even into the chambers and nurseries of private families, and inquire into and pronounce upon the morals and habits and affections or antipathies of the members of every household.... The Federal tribunals can have no power to control the duties or the habits of the different members of private families in their domestic intercourse." Id., 62 U.S. (21 How.) at 602 (Daniel, J., dissenting). The majority did not specifically reject these arguments, but they did not carry the day
 
 
 [14]
 Chalker focuses on a particular phrase in Ankenbrandt--"that the domestic relations exception encompasses only cases involving the issuance of a divorce," 504 U.S. at 704, 112 S.Ct. at 2215--and argues that, because Catz's suit "involves" the issuance of a divorce, the domestic relations exception must apply. Chalker Br. at 24-25
 We reject this reading of the quoted language. We take it to be simply a paraphrase of the idea previously stated, "that the domestic relations exception ... divests the federal courts of power to issue divorce, alimony, and child custody decrees," id. at 703, 112 S.Ct. at 2215 (emphasis added), rather than an expansion of the concept to include every case touching and concerning the issuance of a divorce, the award of alimony, or a child custody decree. Our reading is consistent with other statements in the opinion, e.g. "it makes far more sense to retain the rule that federal courts lack power to issue these types of decrees because of the special proficiency developed by state tribunals," id. at 704, 112 S.Ct. at 2215. Further, by defendants' argument, the jurisdictional exception presumably would have applied in Ankenbrandt itself, for that case too "involved" the issuance of a divorce and a child custody decree--facts that set the stage for the torts sued upon thereafter.
 
 
 [15]
 Although it seems unlikely, we do not reach the question of whether some variant of Burford abstention, as contemplated by the Court in Ankenbrandt, might apply:
 It is not inconceivable, however, that in certain circumstances, the abstention principles developed in Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), might be relevant in a case involving elements of the domestic relationship even when the parties do not seek divorce, alimony, or child custody. This would be so when a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." Colorado River Water Conservation Dist., supra, 424 U.S. at 814, 96 S.Ct. at 1244. Such might well be the case if a federal suit were filed prior to effectuation of a divorce, alimony, or child custody decree, and the suit depended on a determination of the status of the parties. Where, as here, the status of the domestic relationship has been determined as a matter of state law, and in any event has no bearing on the underlying torts alleged, we have no difficulty concluding that Burford abstention is inappropriate in this case.
 Ankenbrandt, 504 U.S. at 705-06, 112 S.Ct. at 2215-16.
 
 
 [16]
 The count seeking a declaration that the Arizona decree was void for failure to accord the Ohio divorce decree full faith and credit might be considered as going to the merits; but Catz's entire suit is not therefore inextricably intertwined with the state-court judgment, because the counts can be considered independently